Andrew Baloga (OR Bar No. 245343)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
(971) 717-6402
dbaloga@biologicaldiversity.org

Andrea Zaccardi (*Pro Hac Vice* pending)
Center for Biological Diversity
P.O. Box 469
Victor, ID  83455
(303) 854-7748
azaccardi@biologicaldiversity.org

Edward B. Zukoski (*Pro Hac Vice* pending)
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO  80202
(303) 641-3149
tzukoski@biologicaldiversity.org

*Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, a non-profit organization, and NOAH GREENWALD, in his individual capacity,<br><br>    Plaintiffs,<br><br>    v. | Case No. _____ |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 1

DOUG BURGUM, in his official capacity as U.S. Secretary of the Interior; U.S. DEPARTMENT OF THE INTERIOR; BROOKE ROLLINS, in her official capacity as U.S. Secretary of Agriculture; U.S. DEPARTMENT OF AGRICULTURE; BUREAU OF LAND MANAGEMENT; and U.S. FOREST SERVICE,

Federal Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.   Plaintiffs Center for Biological Diversity ("the Center") and Noah Greenwald bring this action under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.,* challenging the U.S. Department of Interior ("DOI"), the U.S. Department of Agriculture ("USDA"), the Bureau of Land Management ("BLM"), and the U.S. Forest Service (collectively, "Agencies") failure to consult the U.S. Fish and Wildlife Service ("FWS") and National Marine Fisheries Service ("NMFS") on the impacts of a new "Grazing Action Plan" ("the Plan") on federally protected species and their designated critical habitat, in violation of section 7 of the ESA, 16 U.S.C. § 1536(a)(2).

2.      On October 22, 2025, Defendants Agriculture Secretary Brooke Rollins and Interior Secretary Doug Burgum announced via press release a "Plan for American Ranchers and Consumers," later coined the "Grazing Action Plan." The Plan, linked through the press release, includes a suite of actions to prioritize restocking cattle into vacant allotments on federal lands while simultaneously deregulating grazing. The Plan stated that it would be "launched" via a Memorandum of Understanding.

3.      As promised, on March 31, 2026, Interior Secretary Burgum and Agriculture Secretary Rollins signed a Memorandum of Understanding ("MOU") between DOI, BLM, USDA and the Forest Service outlining cooperation to implement the Grazing Action Plan. Through this MOU, the Agencies agreed to promote the availability of vacant allotments for livestock grazing across 24 million acres of federal land and to expedite processes for permitting grazing, including deregulation.

4.      On the same day the MOU was signed, BLM took steps to implement it, issuing a press release and map advertising hundreds of vacant allotments as "public lands available for … grazing." That map

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 3

was updated soon after to include vacant allotments available for grazing on Forest Service lands.

5. Moreover, on May 12, 2026, BLM proposed revising grazing regulations that greatly restrict the role of the public in public lands grazing decisions; eliminate site-specific evaluations that currently identify grazing impacts to streams, wildlife habitat, and endangered species; restrict grazing permits to "production-oriented livestock," excluding native species such as bison; and allow livestock grazing to continue for years after damage to public lands has been documented.

6. The Plan's directives and intentions to significantly increase and expand livestock grazing may negatively affect federally protected species across the West, including but not limited to grizzly bears, gray wolves, Oregon spotted frogs, Snake River Basin steelhead, bull trout, razorback suckers, Colorado pikeminnow, loach minnows, spikedace, Mexican spotted owls, western yellow-billed cuckoos, and Gunnison sage-grouse.

7. Predators like grizzly bears and wolves are often killed for conflicts with livestock and associated human interactions. Moreover, numerous listed species, including birds, frogs, and fish, rely heavily

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 4

upon healthy riparian habitat, which livestock grazing degrades and impairs, for their survival.

8.    The increase and expansion of livestock grazing may also destroy or adversely modify critical habitat of ESA-listed species. Center surveys of public land critical habitat have shown that livestock grazing is already degrading the majority of such habitat for the western yellow-billed cuckoo in Arizona and New Mexico.

9.    The Agencies' failure to initiate and complete consultation with FWS and NMFS regarding their plan to increase and expand livestock grazing on federal public lands occupied by federally listed species and overlapping critical habitat for listed species violates their procedural and substantive obligations under ESA section 7(a)(2).

10.    By embarking on a program to authorize expanded grazing through the Plan and MOU without completing section 7(a)(2) consultation, the Agencies have irretrievably committed resources and foreclosed the formulation or implementation of any reasonable and prudent alternative measures, in violation of section 7(d) of the ESA. 16 U.S.C. § 1536(d).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 5

11.    Accordingly, Plaintiffs respectfully request this Court to declare that Defendants are in violation of the ESA; vacate and set aside the Grazing Action Plan and associated MOU; order the Agencies to complete consultation with FWS and NFMS that complies with the ESA; and enjoin the Agencies from taking further steps to implement the Grazing Action Plan until the Agencies fully comply with federal law.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as a defendant), and 16 U.S.C. §§ 1540(c), (g) (citizen suit provision of the Endangered Species Act). An actual controversy exists between the parties under 28 U.S.C. § 2201.

13.    This Court has authority to grant the requested relief pursuant to 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief) and 16 U.S.C. § 1540(g) (Endangered Species Act).

14.    Venue lies in this Court pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(b) & (e) because this civil action is brought against agencies of the United States and employees of the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 6

United States acting in their official capacities under the color of legal authority, the Oregon/Washington state office of BLM and the Oregon/Washington Forest Service regional office lies in Portland. Additionally, vacant allotments targeted for cattle grazing are located in this judicial district and include habitat for federally endangered gray wolves and federally threatened Oregon spotted frogs and the frog's critical habitat, thus giving rise to Plaintiffs' claims. Plaintiff Noah Greenwald owns property in this district and enjoys viewing species that may be harmed by the challenged action. The Center maintains an office in this judicial district.

## **PARTIES**

15.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a national, nonprofit conservation organization headquartered in Tucson, Arizona, and supported by more than 101,000 members, including residents in counties where federally listed species reside. The Center and its members wish to see federally-listed species survive and recover, and further with to see critical habitat needed to facilitate recovery protected.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 7

16.    The Center's members regularly seek out opportunities to view the listed species in their habitat, including on areas of public land not currently stocked by livestock. For example, Center member and Plaintiff Noah Greenwald has seen wolves in the wild and makes frequent visits to areas in the U.S. where wolves live, including the Mt. Hood National Forest in his home state of Oregon, with hopes of viewing wolves from either the Mt. Hood or White River wolf packs. In the past year, Mr. Greenwald has visited Mt. Hood dozens of time and has plans to visit the Forest on numerous occasions in the coming year. In particular, Mr. Greenwald visits areas in the Grasshopper Allotment on the Mt. Hood National Forest, which is a vacant allotment in an area utilized by the White River Pack. Mr. Greenwald plans to visit the area with his mountain bike this fall to hopefully view a wolf in the wild. Mr. Greenwald also frequently visits habitats where the threatened Oregon spotted frog lives in central Oregon. He owns a cabin on the Little Deschutes River, which is a stronghold for the species. He frequently hikes and bikes in areas where the Oregon spotted frog lives, including on the Kellems Allotment on BLM lands, which has Oregon spotted frogs and is proposed to be opened to grazing after years of rest. Mr.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 8

Greenwald's interests in the spotted frog will be harmed if this allotment is opened to livestock. A decision requiring the Forest Service and BLM to halt the Grazing Action Plan until it ensures that the Plan can go forward without jeopardizing gray wolves and the Oregon spotted frog will alleviate Mr. Greenwald's harm caused by the Plan and benefit his interests in these species.

17.    Richard Webster, a Center member since 2021, has lived in Portal, Arizona since 2002. Over the last 24 years, Mr. Webster has visited Barfoot Park, Pinery Canyon, and Onion Saddle in the Chiricahua Mountains more than 100 times, primarily for birdwatching, and plans to visit these areas three times a month this year through October. He intends to continue birdwatching and recording bird calls and songs in these areas several times a month during the non-winter months for the foreseeable future. Among the wildlife he has repeatedly seen, heard, and recorded in these areas is the Mexican spotted owl, which is listed as threatened under the Endangered Species Act. Mr. Webster is aware that the areas include critical habitat for the owl. He is also aware that the Forest Service, under the Grazing Action Plan, recently invited ranchers to seek out

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 9

grazing permits for an 11,000-acre allotment that includes Barfoot Park, Pinery Canyon, and the neighboring areas where Mr. Webster has hiked and birdwatched. Mr. Webster is aware that these areas are currently not grazed by livestock and understands that grazing can degrade habitat required for the owl's prey species. He is concerned that authorized grazing will further hamper the regeneration of forests in the area, some of which burned in a 2011 fire, and all of which are threatened with a warming climate. In other areas of the Chiricahuas where cattle are present, Mr. Webster has observed cows trampling and consuming vegetation that provides bird habitat. A decision requiring the Forest Service to halt its Grazing Action Plan until it ensures that the Plan can go forward without jeopardizing the owl will benefit Mr. Webster's interest in the owl and the ecological integrity of Barfoot Park and surrounding lands in the Chiricahuas.

18.  Another Center member, Patrice Mutchnick, regularly visits land within the Jordan Mesa allotment on the Gila National Forest about twice a year since 2018, often with a trip in the spring and one in the fall. One of these two annual trips is a horseback ride from her home in Gila Hot Springs, in which she and friends ride up the Middle

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 10

Fork of the Gila River, over North Mesa, and then down into the East Fork of the Gila River. On these trips, Ms. Mutchnick, a biologist, seeks out wildlife, and enjoys watching fish, including the spikedace and loach minnow; critical habitat for both species is designated in and around the East Fork of the Gila within and adjacent to the allotment. The East Fork is so clear in this area that she can observe the fish. Along Jordan Canyon, within the allotment boundaries, Ms. Mutchnick has camped and at night, heard the Mexican spotted owl hooting, whose critical habitat includes this area of the Jordan Mesa allotment. Ms. Mutchnick is aware that the area she visits is within the now-vacant Jordan Mesa allotment, and she enjoys this area because it is free of cattle, and so the habitat is not degraded by grazing, nor are the waters degraded or fouled by cattle. Ms. Mutchnick understands that the Forest Service recently invited ranchers to seek grazing permits for the Jordan Mesa allotment pursuant to the Grazing Action Plan. She currently has plans to return to this area in the fall of 2026, and the spring of 2027. Ms. Mutchnick has also picnicked, walked, and camped in the Corner Mountain allotment on the Gila National Forest about once a year since 2018, usually during an annual trip in the fall. The

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 11

area is critical habitat for the Mexican spotted owl, so she's on the lookout for owls when there, and hopes to see or hear them. Ms. Mutchnick is aware that the area she visits is within the Corner Mountain allotment, which is a "forest reserve" only intermittently available for livestock grazing, and she enjoys this area because the habitat is not as degraded as those landscape that are permitted for annual cattle grazing. Ms. Mutchnick understands that the Forest Service has invited ranchers to seek grazing permits for the Corner Mountain allotment pursuant to the "Grazing Action Plan." She currently has plans to return to this area in the fall of 2026. Opening the Jordan Mesa and Corner Mountain allotments to regular livestock use, per the Grazing Action Plan, will harm Ms. Mutchnick by increasing cattle sign, degrading ecosystems, adding pollution to rivers and streams, and threatening to harm the habitat of the Mexican spotted owl, the loach minnow, and the spikedace. A decision requiring the Forest Service to halt its Grazing Action Plan until it ensures that the Plan can go forward without jeopardizing the owl and the listed fish will benefit Ms. Mutchnick's interests in those species, and the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 12

ecological integrity of the Jordan Mesa and Corner Mountain allotments and surrounding areas of the Gila National Forest.

19. John Wesiheit has been a Center member since 2016 and has been recreating in, on, and along the Green River in eastern Utah since 1980. He has rafted the Green through Desolation Canyon at least 100 times, and has on many occasions, camped, hiked, and recreated on lands on the east side of the Green River from Tia Juana Bottom to south of the Green's confluence with Sand Wash. Mr. Weisheit is aware that Bureau of Land Management recently invited ranchers to seek a grazing permit for a large allotment located on the east side of the Green River from roughly Tia Juana Bottom to 4-5 river miles downriver from Sand Wash. Mr. Weisheit has recreated on these lands numerous times, and enjoyed seeing these lands and the habitat they support, including during his more than 100 trips rafting Desolation Canyon. Mr. Weisheit is aware that these BLM lands have not been open to livestock grazing for years, and that this area along and in the Green River includes critical habitat for three species listed and protected by the Endangered Species Act: the Colorado pikeminnow, the razorback sucker, and the western yellow-billed cuckoo. Mr. Weisheit

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 13

was amazed at the recovery of riparian habitat that occurred after cattle were no longer permitted in the area. He is aware of areas along the Green River further downriver of this allotment where cattle continue to graze and has been offended by the cattle carcasses and ecological damage that accompany that grazing. Mr. Weisheit enjoys his many rafting and camping trips in the now-closed allotment on the east side of the Green River in part because of the wildlife found there, always hopes to see fish (including the pikeminnow and the razorback) and birds (including the cuckoo), and has long advocated for protection of this habitat and this ecosystem. Mr. Weisheit is also aware that livestock grazing degrades the habitat for those three species. Mr. Weisheit plans to take a trip through Desolation Canyon, and to raft directly adjacent to, and within sight of, the now-vacant allotment in October. A decision requiring the Forest Service to halt its Grazing Action Plan until it ensures that the Plan can go forward without jeopardizing the pikeminnow, the razorback, and the cuckoo will benefit Mr. Weisheit's interests in those species and in the ecological integrity of the Green River corridor.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 14

20. Callie Koch lives near Crested Butte in Gunnison County, Colorado, where she has resided for the past decade, and is a Center member. An avid angler and hunter, Ms. Koch enjoys spending time on public lands in healthy ecosystems. She enjoys seeing Gunnison sage-grouse when she can and is aware that these birds, found only in Colorado and Utah, are protected under the Endangered Species Act. She hunts deer about every other year in and around Hunman Mesa, and about every other year in the Cochetopa Park area, both of which are south of Gunnison, Colorado. She plans to visit both areas again this fall. She has also hiked, driven, and searched for shed antlers about every other year near Quartz Creek east of Gunnison, where she has seen the imperiled Gunnison sage-grouse. She plans to revisit Quartz Creek in the early spring of 2027 and hopes to see Gunnison sage-grouse again. Ms. Koch has viewed the map published by the U.S. Department of Agriculture and U.S. Department of the Interior inviting ranchers to seek grazing permits for currently vacant allotments, and knows that such allotments include the Huntsman Mesa, Cochetopa Park, and Quartz Creek areas in the precise areas where she has hiked and hunted. Ms. Koch is also aware that these same areas where she

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 15

has recreated include designated critical habitat for the Gunnison sage-grouse. The Huntsman Mesa and Cochetopa Park areas already receive increased activity during hunting season. While that appears to be sustainable to maintain sage-grouse, Ms. Koch is concerned that additional impacts of livestock grazing compounded on top of hunting use may push activity beyond the limit that the sage-grouse can tolerate and make the area unsustainable for sage-grouse. This would make it more difficult for her to enjoy these remarkable birds. She is concerned that livestock grazing may also harm sage-grouse habitat in the Quartz Creek area. A decision requiring the Forest Service to halt implementation of the Grazing Action Plan until it ensures that the Plan can go forward without jeopardizing the Gunnison sage-grouse will benefit Ms. Koch's interests in the sage-grouse and the ecological integrity of the Huntsman Mesa, Cochetopa Park, and Quartz Creek areas that she now enjoys and will continue to visit.

21. The Center's members, including Mr. Greenwald, have and continue to research, study, observe, and support enforcing laws to protect listed species. The Center's members and Mr. Greenwald derive

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 16

recreational, conservation, and aesthetic benefits from the existence of listed species in the wild.

22. The Agencies' failure to meet the ESA's nondiscretionary consultation requirements to ensure that agency actions will not jeopardize the continued existence of listed species or destroy or adversely modify critical habitat injures the interests of Plaintiffs.

23. Therefore, the Agencies' failure to consult on the impacts of the Grazing Action Plan will harm the aesthetic, conservation, recreational, scientific, educational, wildlife preservation, and other interests of the Center and its members and Mr. Greenwald. These injuries are actual, concrete injuries presently suffered by Plaintiffs; are directly caused by the Agencies' inaction; and will continue to occur unless this Court grants relief.

24. The requested relief sought in this case would redress these injuries by halting the Plan to increase and expand grazing that may be harmful to listed species and critical habitat until consultation is complete. During consultation FWS or NMFS may require the action agency to adopt mitigation measures or guidelines or may make conservation recommendations to limit or minimize the impacts to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 17

listed species. This Court has the authority to grant Plaintiffs' requested relief. Plaintiffs have no other adequate remedy at law.

25. Defendant DOUG BURGUM is the Secretary of the United States Department of the Interior. In that capacity, Secretary Burgum has supervisory responsibility over the Bureau of Land Management. Secretary Burgum is sued in his official capacity.

26. Defendant BROOKE ROLLINS is the Secretary of the United States Department Agriculture. In that capacity, Secretary Rollins has supervisory responsibility over the United States Forest Service. Secretary Rollins is sued in her official capacity.

27. Defendant DEPARTMENT OF THE INTERIOR oversees the Bureau of Land Management and is a listed party on the Grazing Action Plan MOU.

28. Defendant U.S. DEPARTMENT OF AGRICULTURE oversees the U.S. Forest Service and is a listed party on the Grazing Action Plan MOU.

29. Defendant BUREAU OF LAND MANAGEMENT is a federal government agency within the Department of the Interior and is responsible for the management of approximately 245 million acres of

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 18

public lands under its jurisdiction, including the management of livestock grazing. Among its management responsibilities, BLM must ensure that the activities it authorizes comply with government federal environmental statutes, including the ESA. The Bureau of Land Management is a listed party on the Grazing Action Plan MOU.

30.    Defendant U.S. FOREST SERVICE is a federal government agency within the Department of Agriculture and is responsible for the management of approximately 193 million acres of National Forest and Grasslands lands in the public trust, including the management of livestock grazing. Among its management responsibilities, the Forest Service must ensure that the activities it authorizes comply with government federal environmental statues including the ESA. The Forest Service is a listed party on the Grazing Action Plan MOU.

## STATUTORY FRAMEWORK

### *Endangered Species Act*

31.    The ESA "represent[s] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Its purpose is to "provide a program for the conservation of . . . endangered species and threatened species" and "to provide a means whereby the ecosystems

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 19

upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).

32.    Consistent with this purpose, the ESA proclaims that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act." *Id.* § 1531(c)(1). The ESA defines "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." *Id.* § 1532(3).

33.    Section 7 of the ESA requires each federal agency, in consultation with a federal wildlife agency—FWS for terrestrial and freshwater species and NMFS for marine species and anadromous fish—to ensure that "all activities or program of any kind authorized, funded, or carried out" are not "likely to jeopardize the continued existence" of any endangered or threatened species or "result in the destruction or adverse modification" of critical habitat. *Id.* § 1536(a)(2).

34.    If listed species may be present in the action area, the action agency must prepare a "biological assessment" to analyze "the effects of

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 20

the action" on the species and designated critical habitat. *Id.* § 1536(c)(1); 50 C.F.R. § 402.12. The "effects of the action" are "all consequences to listed species or critical habitat that are caused by the proposed action … but that are not part of the action." 50 C.F.R. § 402.02. The "action area" includes "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." *Id.*

35.    More generally speaking, an agency must initiate consultation any time an action "may affect" listed species or critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). The threshold for a "may affect" determination and the required section 7 consultation is "low." *See, e.g., W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 496 (9th Cir. 2011) (quoting 51 Fed. Reg. 19,926, 19,949 (June 3, 1986)). An agency is required to review its actions "at the earliest possible time" to determine whether the action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a).

36.    ESA regulations broadly define the scope of agency "actions" requiring section 7 consultation to include "all activities or programs of any kind authorized, funded, or carried out in whole or in part, by

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 21

Federal agencies," including any "actions directly or indirectly causing modifications to the land, water or air." 50 C.F.R. § 402.02. The Ninth Circuit has acknowledged the breadth of actions requiring consultation, including interim management strategies. *See Karuk Tribe of Cal. v. USFS*, 681 F.3d 1006 (9th Cir. 2012) (*en banc*) (holding the Forest Service violated the ESA by not consulting before approving notices of intent to conduct mining activities in coho salmon critical habitat); *Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290 (9th Cir. 1992) (holding BLM's strategy setting forth criteria for selection of land for logging was agency action subject to section 7 consultation); *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) (holding consultation was required for an oil gas lease program and not just at the leasing stage).

37. Even if future actions would themselves be subject to the consultation requirement, consultation at the programmatic level helps fulfill the ESA's conservation purpose. Such programmatic consultations "allow the Services to consult on the effects of programmatic actions such as … [a] proposed program, plan, policy, or regulation providing a framework for future proposed actions." 50 C.F.R. § 402.02. Programmatic consultation allows the FWS to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 22

undertake "a broad-scale examination of a program's potential impacts on a listed species and its designated critical habitat—an examination that is not as readily conducted when the later, action-specific consultation occurs on a subsequent action developed under the program framework." 80 Fed. Reg. 26,832, 26,836 (May 11, 2015). This enables FWS "to determine whether a program and its set of measures intended to minimize impacts or conserve listed species are adequately protective." *Id*. *See also* FWS, Endangered Species Consultation Handbook (March 1998) at 5-1 (programmatic consultation aids agencies and species protection "[b]y identifying potential program effects and developing guidelines to minimize these effects to listed species and designated critical habitats").

38.    Furthermore, once the agency initiates consultation, under section 7(d) the action agency shall not make any irretrievable commitment of resources, having the effect of "foreclosing the formulation or implementation of any reasonable and prudent measures which would not violate subsection (a)(2) of this section." 16 U.S.C. § 1536(d). Congress enacted this provision "to ensure that the status quo would be maintained during the consultation process, to prevent

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 23

agencies from sinking resources into a project in order to ensure its completion regardless of its impacts to endangered species." *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1034-35 (9th Cir. 2005). This prohibition remains in force during the consultation process and continues until the requirements of section 7(a)(2) are satisfied. 50 C.F.R. § 402.09.

## FACTUAL BACKGROUND

### *The Grazing Action Plan*

39.    On October 22, 2025, Defendants Agriculture Secretary Brooke Rollins and Interior Secretary Doug Burgum announced via press release a "Plan for American Ranchers and Consumers," which they identified as "a suite of actions to strengthen the American beef industry."[1] Secretary Rollins committed to "immediately expedite deregulatory reforms" and address "outdated grazing restrictions."[2]

---

[1] USDA, Press Release, *Secretary Rollins Announces Plan for American Ranchers and Consumers* (Oct. 22, 2025), available at https://www.usda.gov/about-usda/news/press-releases/2025/10/22/secretary-rollins-announces-plan-american-ranchers-and-consumers (last visited Aug. 10, 2026).

[2] *Id.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 24

40.    In conjunction with this press release, the USDA released a "White Paper" describing details of the Plan. Such details include proposing to reopen vacant grazing allotments – federal lands where no one has a permit to graze livestock – across approximately 24 million acres of Forest Service and BLM lands nationwide, expediting federal livestock permit renewals, and developing new standards of evidence to compensate ranchers for livestock predations.[3]

41.    On March 31, 2026, Interior Secretary Burgum and Agriculture Secretary Rollins signed an MOU to act together in implementing a "Grazing Action Plan."[4] Through this MOU, BLM and the Forest Service generally agreed to address the economic desires of grazing permittees in large part by increasing grazing within allotments and expanding grazing into vacant allotments, all while simultaneously deregulating grazing.

---

[3] *See USDA Plan to Fortify The American Beef Industry: Strengthening Ranches, Rebuilding Capacity, And Lowering Costs For Consumers* (Oct. 20, 2025), available at https://www.usda.gov/sites/default/files/documents/USDA%20Beef%20Industry%20Plan%20White%20Paper.pdf (last visited Aug. 10, 2026).
[4] *See* Memorandum of Understanding, *Advancing Grazing on Forest Service and BLM Lands,* available at https://www.usda.gov/sites/default/files/documents/mou-advancing-grazing-usfs-blm.pdf (hereinafter, "MOU") (last visited Aug. 10, 2026).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 25

42.    Specifically, the agencies agreed to, *inter alia*, the following:

- Promote the availability of vacant allotments for livestock grazing. MOU ¶5, at 2.

- Increase the extent to which vacant allotments are available for long-term stocking. MOU ¶9, at 2-3.

- Take actions to implement a goal of a no net loss of Animal Unit Months (AUMs) within allotments. MOU ¶10, at 3.

- Weaken grazing regulations and guidance to favor those seeking to profit from raising livestock on public land. MOU ¶11, at 3.

43.    Taken together, these agreed-upon actions would increase and expand grazing, seemingly without regard for the harms to other resources and values, including likely harm to federally protected species.

44.    The MOU states that it will remain in effect for five years. MOU at 4.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 26

45.     On the same day the MOU was signed, BLM began to implement it by issuing a press release and map advertising hundreds of vacant allotments as "public lands available for … grazing."[5]

46.     In the press release, BLM stated the following:

> The Bureau of Land Management today announced the launch of a new web-based map tool designed to connect ranchers with information on vacant grazing allotments on public lands available for targeted prescribed grazing …. The BLM is coordinating with federal partners to identify more vacant areas that may be suitable for grazing, expanding the options available to producers over time. The public is encouraged to check back soon for additional opportunities. All lands identified in the new tool have been evaluated for forage, land health conditions, and suitability for sustainable grazing.[6]

The "new tool" referenced in the press release is a map depicting the location of lands upon which the agencies sought to increase livestock grazing, including on lands administered by the BLM, Forest Service,

---

[5] *See* BLM, press release, *BLM launches new web tool to expand grazing opportunities and support healthier public lands*, (Mar. 31, 2026), available at https://www.blm.gov/press-release/blm-launches-new-web-tool-expand-grazing-opportunities-and-support-healthier-public (last visited Aug. 10, 2026).

[6] *Id.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 27

National Park Service, and the FWS.[7] The map was subsequently revised to remove the Park Service and FWS lands as among those where the agencies sought to increase grazing.

47.    USDA also issued a press release that day, confirming the vast extent of the Plan in stating that under the MOU, "24 million acres[] are not under permit but are targeted as opportunities to allow more grazing on federal lands."[8]

48.    By June 5, the online map displayed dramatically increased acreage of Forest Service vacant grazing allotments.

49.    One of BLM's top officials has made it clear that the agency plans to move cattle into vacant allotments quickly. In a video posted on YouTube in December, Interior Department official Karen Budd-Falen told Senator Cynthia Lummis that "[t]here are around 1,300 vacant

---

[7] BLM Map, *Federal Grazing Lands Potentially Available*, available at https://experience.arcgis.com/experience/0a208d6eac6144969213c68519 a8cfdd/page/Page?utmmedium=email&utm_source=substack&views=C hoose-Basemap (last visited Aug. 10, 2026).

[8] USDA, press release, *USDA, DOI Move to Boost Support for American Ranchers, Help Lower Prices for Consumers* (Mar. 31, 2026), at https://www.usda.gov/about-usda/news/press-releases/2026/03/31/usda-doi-move-boost-support-american-ranchers-help-lower-prices-consumers (last visited Aug. 10, 2026).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 28

allotments for the [Bureau of Land Management] right now," and that "[b]y the end of next year, every single vacant allotment will be filled by a rancher ...."[9]

50.    Similarly, on June 12, Secretary Rollins issued a letter to Forest Service employees noting that the Forest Service has already "initiated several of the actions outlined in the MOU and is preparing to fully implement the Grazing Plan," and included direction for "further implementing the Grazing Plan and MOU."[10]

51.    That direction to Forest Service employees, in the form of a letter from Michael Boren, the United States Under Secretary of Agriculture for Natural Resources and Environment to the Chief of the U.S. Forest Service, mandated "expedite[d]" implementation of the MOU and Grazing Action Plan and urged the Forest Service to

---

[9] *See* Public Domain, *Top Interior Official Ensnared In Second Major Scandal* (May 11, 2026), available at https://www.publicdomain.media/p/top-interior-official-ensnared-second-scandal (last visited Aug. 10, 2026).

[10] Letter of B. Rollins, USDA Secretary to All Forest Service Employees, re: *Line Officer Implementation of the Advancing Grazing on Forest Service and BLM Lands Memorandum of Understanding and the USDA-DOI Grazing Action Plan* (June 12, 2026), available at https://www.usda.gov/sites/default/files/documents/forest-service-grazing-memo.pdf (last visited Aug. 10, 2026).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 29

"streamline and expand livestock grazing on federal lands," including "[e]xpanding access to prioritize permitting vacant and closed allotments."[11]

52.    On May 12, 2026, BLM also proposed revising grazing regulations that greatly restrict the role of the public in public lands grazing decisions; eliminate site-specific evaluations that currently identify grazing impacts to streams, wildlife habitat, and endangered species; restrict grazing permits to "production-oriented livestock," excluding native species such as bison; and allow livestock grazing to continue for years after damage to public lands has been documented.

53.    Upon information and belief, throughout this process, the Agencies have never initiated or completed consultation with FWS or NMFS on how this increase and expansion of grazing, and the deregulation of grazing, may affect numerous federally protected species or critical habitat.

---

[11] Letter of M. Boren, USDA Under Secretary to T. Schultz, Chief, U.S Forest Service (June 12, 2026), available at https://www.usda.gov/sites/default/files/documents/forest-service-grazing-memo.pdf (last visited Aug. 10, 2026).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 30

### *The Plan May Affect Listed Species and Their Critical Habitat*

54.    It has long been known that livestock grazing can harm wildlife. A 1994 federal report found that the U.S. Fish and Wildlife Service identified livestock grazing as a contributing factor to the endangerment of 187 of 667, or more than 28%, of all then-listed species in the U.S.[12]

55.    Livestock grazing can cause direct and indirect harm to wildlife.

56.    Livestock grazing can degrade the habitat that wildlife depends upon. Livestock grazing can damage water quality and quantity that wildlife depends upon. Livestock can harm air quality by releasing methane and ammonia.

57.    The presence of livestock on the landscape can lead to conflicts with native predators, including grizzly bears and gray wolves. Conflicts with livestock and associated human interactions often lead to

---

[12] C.H. Flather et. al., *Species Endangerment Patterns in the United States* (Jan. 1994) at 11, Forest Service General Technical Report RM-241, available at https://www.fs.usda.gov/rm/pubs_series/rm/gtr/rm_gtr241.pdf (last visited Aug. 10, 2026).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 31

these carnivores being relocated or killed by federal agency personnel, state agency personnel, or livestock owners and their staff.[13]

58.    Conflicts with livestock have also led to illegal killing of predators, including grizzly bears and wolves.[14] Such poaching is often referred to as "Shoot, Shovel, and Shut Up."[15] And more often than not,

---

[13] *See, e.g.,* Adrian Treves, Mika Krofel & Jeannine McManus, *Predator control should not be a shot in the dark*, 14 Front. Ecol. & Env't 380 (2016) (large number of predators killed by government agencies and by private citizens over livestock conflicts); Lily M. van Eeden et al., *Carnivore conservation needs evidence-based livestock protection,* 16 PLoS Biol e2005577 (2018) (predation on livestock often leads to killing of carnivores); Bruce N. McLellan, Fred W. Hovey & John G. Woods, *Rates and Causes of Grizzly Bear Mortality in the Interior Mountains of Western North America*, in *Proceedings of a Conference on the Biology and Management of Species and Habitats at Risk* 673 (Kamloops, B.C. 1999) (grizzly bears being shot for killing livestock was a major mortality factor).

[14] *See, e.g.,* Bozeman Daily Chronicle, *Documents show sheepherder shot grizzly bear* (Apr. 11, 2014) (discussing how FWS determined a sheepherder illegally killed a grizzly bear in the Gravelly Mountains after the bear killed three sheep), at https://www.bozemandailychronicle.com/news/wildlife/documents-show-sheepherder-shot-grizzly-bear/article_2087248a-c1d0-11e3-adce-0019bb2963f4.html (last visited Aug. 10, 2026).

[15] *See* High Country News, *How grizzly bear poachers are getting away with it*, at https://www.hcn.org/articles/bears-how-grizzly-bear-poachers-are-getting-away-with-it/ (Dec. 20, 2023) (last visited Aug. 10, 2026).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 32

the Department of Justice declines to prosecute grizzly bear and wolf poachers.[16]

59.    Livestock grazing may also displace native wildlife such as elk and deer due to competition with cattle.[17] Replacing elk and deer—natural food sources for carnivores—with cattle can increase the carnivores' predation upon livestock.

60.    Moreover, on information and belief, at least some of the vacant allotments that the Plan seeks to open to livestock use have not been grazed by cattle for years and are now being used by listed carnivore species. Thus, restocking vacant allotments with livestock is likely to increase conflicts between carnivores and livestock and remove and fragment habitat being used by these carnivores.[18]

---

[16] *See, e.g., id.*

[17] *See, e.g.,* Kelley M. Stewart et al., *Temporospatial Distributions of Elk, Mule Deer, and Cattle: Resource Partitioning and Competitive Displacement*, 83 J. Mammalogy 229 (2002).

[18] *See, e.g.,* FWS, Biological Opinion for the Effects to the Grizzly Bear from the Upper Green River Area Rangeland Project (Apr. 29, 2019) ("Upper Green BiOp"), at 39 (stating grazing displaces grizzly bears from habitat as a result of humans and other activities associated with livestock grazing).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 33

61.    Fragmented habitat leading to carnivores being displaced can negatively impact an animal's feeding, breeding, or sheltering.[19] Fragmented habitat also impairs connectivity needed for genetic health and range expansion.[20]

62.    The Interior Department and U.S. Department of Agriculture's "web-based map tool" displays approximately 100 vacant allotments that overlap grizzly bear habitat in Idaho, Montana, and Wyoming as "*potential* opportunities for grazing" under the Grazing Action Plan.

63.    The map also shows more than two dozen vacant allotments in western Washington, western Oregon and northern California, where federally protected gray wolves live that the Grazing Action Plan targets for increasing livestock numbers.

64.    Carnivores are not the only wildlife impacted by grazing. For example, livestock grazing has harmed and is likely to harm Oregon

---

[19] *See, e.g. id.* at 39, 47.

[20] *See, e.g.,* Sarah N. Sells et al., *Predicted connectivity pathways between grizzly bear ecosystems in Western Montana*, 284 Biological Conservation (2023).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 34

spotted frogs, an amphibian FWS listed as threatened under the ESA since 2014.[21]

65.    In its listing decision, FWS concluded that "[h]abitat necessary to support all life stages [of the Oregon spotted frog] is continuing to be impacted and/or destroyed by … increased sedimentation, increased water temperatures, reduced water quality, and vegetation changes resulting from the timing, intensity, and location of livestock grazing."[22] "Livestock graze and trample emergent and riparian vegetation, compact soil in riparian and upland areas, and reduce bank stability, which results in increased sedimentation and water pollution via urine and feces. The resulting increases in temperature and sediment production, alterations to stream morphology, effects on prey organisms, and changes in water quality negatively affect Oregon spotted frog habitat."[23] In designating critical habitat approximately two years later, FWS affirmed that livestock

---

[21] FWS, *Threatened Status for Oregon Spotted Frog*, 79 Fed. Reg. 51658 (Aug. 29, 2014).

[22] 79 Fed. Reg. at 51706.

[23] 79 Fed. Reg. at 51674 (citations omitted).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 35

grazing constituted a "[t]hreat[] to the physical or biological features that are essential to the conservation" of the Oregon spotted frog.[24]

66.    At least three vacant BLM allotments in Oregon identified on the Grazing Action Plan map as "available" for grazing overlap with critical habitat for the Oregon spotted frog.

67.    The Plan may also affect listed fish species in the Pacific Northwest and northern Rocky Mountains.

68.    Livestock grazing can degrade and historically has degraded fish habitat in the Pacific Northwest.

69.    For example, the most recent five-year status review for the Snake River Basin steelhead concluded that livestock grazing represents one of the "key threats" to steelhead because it "erode[s] river banks, introduce[s] sediment load, and impair[s] riparian vegetation and large wood contribution."[25]

---

[24] FWS, *Designation of Critical Habitat for the Oregon Spotted Frog,* 81 Fed. Reg. 29366, 29355 (May 11, 2016).

[25] NOAA, *2022 5-Year Review: Summary & Evaluation of Snake River Basin Steelhead* (July 16, 2022), at 50, available at https://repository.library.noaa.gov/view/noaa/45368 (last visited Aug. 10, 2026).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 36

70.    There are dozens of vacant Forest Service or BLM allotments in California, Idaho, Oregon, and Washington advertised by the Grazing Action Plan as "available" for grazing that contain streams that are designated critical habitat for steelhead.

71.    Similarly, the most recent status assessment for federally listed bull trout recognizes that livestock grazing can "degrade[] bull trout habitat by removing or degrading riparian vegetation, destabilizing streambanks, widening stream channels, promoting incised channels, lowering water tables, reducing pool frequency, increasing soil erosion and altering water quality."[26]

72.    There are more than a dozen vacant Forest Service and BLM allotments in Idaho, Montana, Oregon, and Washington that contain or are directly adjacent to streams that are designated critical habitat for bull trout. The Grazing Plan identifies these vacant allotments as targeted for opening to livestock.

---

[26] FWS, *Species Status Assessment For the Conterminous Distinct Population Segment Of Bull Trout (Salvelinus confluentus)* (Sept. 2024), at 76-77, available at https://www.fws.gov/node/5180211 (last visited Aug. 10, 2026).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 37

73.    Fish in the Southwest are also at risk, including razorback suckers, Colorado pikeminnow, loach minnows, and spikedace.

74.    Razorback suckers and Colorado pikeminnow are fish that inhabit the Colorado River Basin. The razorback is listed as threatened and the pikeminnow as endangered under the ESA. FWS's 1994 decision designating critical habitat for both (and other) imperiled Colorado River fish listed "grazing" as an activity that "may destroy or adversely modify critical habitat" of the fish species.[27]

75.    At least two BLM allotments in Colorado and Utah identified on the Grazing Action Plan map as "available" for grazing overlap with critical habitat for the razorback sucker and the Colorado pikeminnow.

76.    Loach minnow and spikedace are two fish that inhabit streams in Arizona and New Mexico. FWS's listing decision determining the two fish are endangered and designating critical habitat for them states: "livestock grazing within watersheds where spikedace and loach minnow and their habitats are located continues to cause adverse

[27] FWS, *Determination of Critical Habitat for the Colorado River Endangered Fishes: Razorback Sucker, Colorado Squawfish, Humpback Chub, and Bonytail Chub*, 59 Fed. Reg. 13374, 13387 (Mar. 21, 1994).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 38

effects. These adverse effects occur through watershed alteration and subsequent changes in the natural flow regime, sediment production, and stream channel morphology." [28] FWS's listing decision also states: "Livestock grazing management also continues to include construction and maintenance of open stock tanks, which are often stocked with nonnative aquatic species harmful to spikedace and loach minnow."[29]

77.    The Grazing Action Plan map shows as "available" for grazing allotments in Arizona and New Mexico that overlap with critical habitat for the loach minnow and the spikedace.

78.    The expansion of grazing may also negatively impact other species in Arizona and New Mexico that depend on healthy riparian habitat to survive, including Mexican spotted owls and western yellow-billed cuckoos.

79.    Because livestock grazing has both direct and indirect effects on streams it is a leading cause of riparian species endangerment in the

---

[28] FWS, *Endangered Status and Designations of Critical Habitat for Spikedace and Loach Minnow*, 77 Fed. Reg. 10810, 10817 (Feb. 23, 2012) (citations omitted).

[29] *Id.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 39

Southwest.[30] Scientific study on the impacts of livestock grazing on aquatic and riparian habitats in the Southwest is extensive and universally shows severe and lasting negative impacts.

80.    For example, livestock directly affects riparian habitat through the removal of riparian vegetation. Loss of riparian vegetation in turn raises water temperatures, reduces bank stability, and eliminates an important structural component of the stream environment that contributes to the formation of pools. In combination, loss of riparian vegetation and bank erosion can irreversibly alter riparian ecosystems.

81.    Complete exclusion of cattle is widely accepted as a minimum baseline management strategy in preserving stream health.

82.    Mexican spotted owls inhabit forests and steep canyons in the American Southwest, and often forage in riparian areas. FWS's recovery plan for the owl identifies livestock grazing as a threat

---

[30] *See, e.g.,* FWS, Western yellow-billed cuckoo (western DPS): listed as threatened October 3, 2014 (79 Fed. Reg. 59991), final critical habitat designated April 21, 2021 (86 Fed. Reg. 20815).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 40

throughout the owl's range.[31] The recovery plan suggests a number of strategies for restoring riparian areas in owl habitat degraded by livestock grazing including the "[r]eduction in numbers of grazing animals" and the "[e]xclusion of [g]razing."[32]

83. The Forest Service manages at least ten vacant allotments in Arizona, Colorado, and New Mexico that the Grazing Action Plan targets for opening to livestock that overlap critical habitat for the Mexican spotted owl.

84. Center surveys of public land critical habitat have shown that livestock grazing is already adversely affecting the majority of public lands critical habitat for the western yellow-billed cuckoo in Arizona and New Mexico.[33] The species was listed in 2014, and that

---

[31] FWS, *Mexican Spotted Owl Recovery Plan, First Revision* (Sept. 2012) at 43-44, 289, available at https://ecos.fws.gov/docs/recovery_plan/MSO_Recovery_Plan_First_Revision_Dec2012.pdf (last visited Aug. 10, 2026).

[32] *Id.* at 290.

[33] *See* Center for Biological Diversity, *Grazed to Death: Livestock Production Adversely Modifying Majority of Drought-Stricken Western Yellow-Billed Cuckoo Critical Habitat on Public Lands in Arizona and New Mexico* (June 2024), available at https://biologicaldiversity.org/species/birds/yellow-billed_cuckoo/pdfs/Cuckoo-Adverse-Modification-Report_CBD_2024.pdf (last visited Aug. 10, 2026).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 41

decision recognized that "conversion of riparian areas for agricultural crops and livestock grazing has been, and continues to be, a major contributor to riparian habitat loss and degradation" of the cuckoo's habitat.[34] In designating critical habitat for the cuckoo in 2021, FWS stated: "The loss of habitat from numerous threats is well documented throughout the range of the western yellow-billed cuckoo. One compendium identifies 480 state-of-knowledge publications about the threats facing and factors contributing to the loss of riparian habitat in the West, including … grazing …."[35]

85.    BLM and the Forest Service manage at least a dozen vacant allotments across the West that the Grazing Action Plan targets for opening to livestock that overlap critical habitat for the western yellow-billed cuckoo.

86.    The Bureau of Land Management manages numerous vacant allotments that the Grazing Action Plan seeks to stock with

---

[34] FWS, *Determination of Threatened Status for the Western Distinct Population Segment of the Yellow-billed Cuckoo*, 79 Fed. Reg. 59991, 60019-60020 (Oct. 3, 2014).

[35] FWS, *Designation of Critical Habitat for the Western Distinct Population Segment of the Yellow-Billed Cuckoo*, 86 Fed. Reg. 20815, 20820 (Apr. 21, 2021).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 42

livestock in Colorado's Gunnison Basin and elsewhere that include designated critical habitat for the threatened Gunnison sage-grouse.

87.    FWS's critical habitat designation for the Gunnison sage-grouse concludes that "[f]actors potentially affecting the physical and biological features of the Gunnison Basin Unit [of sage-grouse critical habitat] include … past and present grazing management that degrades or eliminates vegetation structure …  which can result in the loss, degradation, or fragmentation of sagebrush plant communities" upon which the Gunnison sage-grouse rely.[36] FWS's 2014 decision listing the Gunnison sage-grouse concluded that "historical livestock grazing practices and overgrazing were a contributing factor in the early loss and degradation of sagebrush habitats and initial declines in sage-grouse numbers and distribution," and that "even reduced numbers of livestock still pose impacts."[37] The listing decision identified numerous threats posed by grazing management, including nest destruction by trampling cattle, the spread of invasive cheatgrass, construction of

---

[36] FWS, *Designation of Critical Habitat for Gunnison Sage-Grouse*, 79 Fed. Reg. 69312, 69343 (Nov. 20, 2014).

[37] FWS, *Threatened Status for Gunnison Sage-Grouse,* 79 Fed. Reg. 69192, 69243 (Nov. 20, 2014).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 43

habitat-altering water structures and fences (with which grouse can collide), and alteration of fire frequency, and states that livestock grazing "can reduce the suitability of breeding and brood-rearing habitat, negatively affecting sage-grouse populations."[38]

88.    These examples demonstrating that the Grazing Action Plan may affect wildlife protected by the Endangered Species Act are representative, not exhaustive. Vacant allotments that the Plan seeks to open to livestock grazing also include critical habitat for the Pacific marten and marbled murrelet in Oregon, vernal pool tadpole shrimp in California, the jaguar in Arizona, Quino checkerspot butterfly in California, the Canada lynx in Washington, Idaho, Montana, and Wyoming, and many other species of imperiled wildlife.

89.    On information and belief, none of the federal agencies implementing the Grazing Action Plan and the MOU – not USDA, not DOI, not BLM, and not the Forest Service – has engaged in ESA section 7 consultation to assess the impacts of the Plan, including its plan to put livestock on 24 million acres of public land not currently under permit for livestock grazing.

---

[38] 79 Fed. Reg. at 69243-44, 69249.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 44

90.   On April 29, 2026, Plaintiff Center for Biological Diversity provided sixty days' notice of intent to file suit pursuant to the ESA's citizen suit provision. 16 U.S.C. § 1540(g). More than 60 days have passed since Defendants' receipt of the Center's notice letter. Defendants did not respond to the letter, nor have they acted to remedy their continuing ESA violations by the date of this complaint's filing.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of ESA Section 7(a)(2)

91.   Plaintiffs re-allege and incorporate by reference the preceding paragraphs.

92.   Section 7(a)(2) requires agencies to ensure through consultation that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [their designated critical] habitat." 16 U.S.C. § 1536(a)(2).

93.   The ESA's implementing regulations require action agencies to initiate consultation whenever a proposed action "may affect" listed species. 50 C.F.R. § 402.14(a).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 45

94.    ESA regulations broadly define the scope of agency "actions" requiring section 7 consultation to include "all activities or programs of any kind authorized, funded, or carried out in whole or in part, by Federal agencies," including any "actions directly or indirectly causing modifications to the land, water or air." 50 C.F.R. § 402.02.

95.    The Grazing Action Plan and the MOU are agency actions requiring consultation within the meaning of the ESA.

96.    As described above, there is no question that the expanded grazing authorized through the Grazing Action Plan and MOU "may affect," and indeed will affect, listed species and their critical habitat.

97.    The Agencies' have discretion to influence or change the activity for the benefit of protected species by, for example, requiring evaluation and implementation of mitigation measures to protect listed species and critical habitat. For example, they could require that cattle be excluded from accessing riparian areas, or require that permittees implement nonlethal deterrents for predators.

98.    The Agencies have failed to initiate and complete consultation regarding the implementation of the Grazing Action Plan as required by ESA section 7(a)(2).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 46

99.    Defendants are therefore violating, and will continue to violate, section 7(a)(2) of the ESA and its implementing regulations by failing to ensure through completion of consultation that the Agencies' implementation of the Grazing Action Plan does not jeopardize the continued existence of listed species or destroy or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

### SECOND CLAIM FOR RELIEF
### Violation of ESA Section 7(d)

100.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs.

101.    Upon information and belief, the Agencies may initiate consultation to comply with the ESA's consultation requirements. Upon initiation of consultation, the Agencies are subject to ESA section 7(d), which requires that once an agency initiates section 7(a)(2) consultation, the agency "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measure which would not violate subsection (a)(2)." 16 U.S.C. § 1536(d). The purpose of section

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 47

7(d) is to preserve the status quo and prevent harm to listed species and critical habitat during section 7(a)(2) consultation.

102. This prohibition "continues until the requirements of section 7(a)(2) are satisfied." 50 C.F.R. § 402.09.

103. The Agencies signed the MOU implementing the Grazing Action Plan, and have further taken actions such as advertising as "available" for livestock grazing vacant allotments, before satisfying section 7(a)(2)'s procedural and substantive requirements.

104. By executing the MOU and moving forward with implementation of the Plan before completing section 7(a)(2) consultation with FWS or NMFS, the Agencies foreclosed themselves from formulating or implementing reasonable and prudent alternative measures to avoid jeopardizing listed species and destroying or adversely modifying critical habitat.

105. The Agencies' irretrievable commitment of resources in a manner that foreclosed the formulation or implementation of reasonable prudent alternatives to protected listed species and critical habitat violates section 7(d) of the ESA, 16 U.S.C. § 1536(d), and its implementing regulations, 50 C.F.R. § 402.09.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 48

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court:

(A)   Declare that Defendants violated the Endangered Species Act as alleged herein;

(B)   Vacate and set aside the Grazing Action Plan and the Memorandum of Understanding;

(C)   Order the Agencies to initiate and complete consultation with FWS and NMFS by a date certain;

(D)   Enjoin the Agencies from taking actions directed by the Grazing Action Plan and MOU until they comply with the ESA;

(E)   Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, under 16 U.S.C. § 1540(g)(4) or 28 U.S.C. § 2412; and

(F)   Grant Plaintiffs such further and additional relief as the Court may deem just and proper.


Respectfully submitted this 13th day of August, 2026,

*Andrew Baloga*
Andrew Baloga (OR Bar No. 245343)
Center for Biological Diversity
P.O. Box 11374

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 49

Portland, OR 97211
(971) 717-6402
dbaloga@biologicaldiversity.org

Andrea Zaccardi (P*ro Hac Vice* pending)
Center for Biological Diversity
P.O. Box 469
Victor, ID  83455
(303) 854-7748
azaccardi@biologicaldiversity.org

Edward B. Zukoski (*Pro Hac Vice* pending)
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO  80202
(303) 641-3149
tzukoski@biologicaldiversity.org

*Counsel for Plaintiffs*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 50